**UNITED STATES of America, Plaintiff,**

**v.**

**Larry Mitchell DUDLEY, Susan Hope Dudley, Defendants.**

**No. IP 93–141–CR.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 9, 1994.

Mark Inman, Indianapolis, IN, for plaintiff.

Susan E. Dowd, Asst. U.S. Atty., Indianapolis, IN, for defendants.

### Entry Regarding Defendants' Motion to Suppress

TINDER, District Judge.

### I. Findings of Fact

Larry and Susan Dudley set out from Alabama in August, 1993, hoping to find a better life. As though cast in a modern version of Steinbeck's classic *The Grapes of Wrath,* the Dudleys converted their Ford Ranger pickup into a homemade "camper" by adding a self-constructed shell to the bed of the truck, and loading aboard what must have been all of their personal belongings, including "his-n-her" televisions and air rifles along with more than a truckfull of other items. Unfortunately, several less savory objects were among this collection: Two sawed-off shotguns, three pipe bombs and rounds of various types of gun ammunition. Possession of these objects was unfortunate for the Dudleys for several reasons. First, both Dudleys are convicted felons, making their possession of any sort of firearm a violation of federal law. *See* 18 U.S.C. § 922(g). Additionally, possession of shotguns of reduced length and pipe bombs violate federal law. *See* 26 U.S.C. §§ 5861(d), 5871. With all this in tow, the Dudleys set out on their unlucky journey with great hope of a better future.

Their travels brought them to the State of Indiana in the latter part of August as they voyaged north to visit a friend in the city of Selma, Indiana. This route took the Dudleys near Seymour, Indiana, where their luck turned for the worse. First, their trusty Ford Ranger suddenly developed mechanical difficulties along U.S. Highway 31 near a Truckstop of America located at the intersection of Highway 31 and Indiana Road 50. Larry described the truck as having "fried

out." In the finest tradition of Hoosier hospitality, the Dudleys quickly received help from a passing motorist to push their truck to the truckstop; Susan obtained permission from the truckstop manager to keep the disabled vehicle in an out-of-the-way part of the stop while attempting repairs. There, the Dudleys set up a sort of encampment fashioning a tarp or awning over the engine area of the truck. Being short on funds, but long on ingenuity, Larry decided to fix the truck himself, and, working from his Ranger repair manual, he began tinkering with various parts of the truck in a process of elimination. Upon completing each repair, Larry attempted to start the vehicle; as each attempt failed, he proceeded to the next suspected problem. This process continued for three days, during which time the Dudleys slept in their truck as best they could considering they were stalled at a reasonably busy truck stop. The accommodations were to say the least, neither roomy nor comfortable. In need of money, the Dudleys accepted the kindness of a stranger who gave them a small sum, received a wire transfer of a small amount from Larry's brother, and began selling some of their personal belongings.

As of 5:30 on the evening of August 27, Larry had yet to successfully repair the truck. At that moment, Sergeant Roger Martin of the Seymour Police Department drove his marked police car into the truck stop and proceeded to park near the Dudleys' truck; two additional Seymour police vehicles were also on their way to the truckstop. Neither Martin nor the other officers knew anything about the Dudleys, the Dudleys' vehicle, or the Dudleys' dangerous cargo, except what was learned from a Seymour Police Department dispatcher moments earlier. That announcement indicated the manager of the truckstop reported a customer had observed guns in the Dudleys' vehicle.[1]

---

1. There is a significant dispute about the content of the dispatch. Sergeant Martin testified at the suppression hearing that the radio message was "there was a truck broken down there [truckstop] and that the occupants of the truck were trying to sell some guns." (Motion to Suppress Hrg.Tr. at 6 [hereinafter "MTS Tr."].) However, when confronted with the "radio ticket" of the call—Defendant's Exhibit 28, a handwritten transcript or synopsis of the Seymour Police Department radio traffic regarding this incident—Sergeant Martin conceded that the ticket reflected the actual content of the call he had received. (*Id.* at 34). That ticket indicated the reason for the dispatch was a "suspicious person(s) and vehicle" and that the call received from the truckstop manager regarded a "pickup parked near old scale house w/tarp on front. Truck Driver reported seeing several "Sig 18's" [guns] in vehicle." That the radio message referred

Arriving at the scene, Martin saw a vehicle containing a lot of "stuff" with a tarp strung over and slightly beyond the engine area of the vehicle, Larry underneath the truck attempting a repair and Susan standing near the passenger side of the truck. Martin parked his car twenty-five to thirty feet from the driver's door of the truck and approached the vehicle, when, after walking about four steps toward the truck, Larry crawled out from under the truck and started toward the officer. Susan moved to the back of the truck and was beyond Martin's view. Martin claims he backed up to his car to call for another police unit.[2] Martin and Larry met about halfway between the police car and the truck; Martin advised Larry of the nature of the call he had received.[3] After Larry responded he had only air rifles in the truck, he and Martin walked to the rear of the truck where Larry reached in and pulled out a pair of air rifles. Martin, unsatisfied with this production, explained he did not believe air rifles were the type of weapons referred to in the call from the manager of the truck-

stop. The pair then walked to the driver's side door of the truck (which was open) where Larry stopped with Martin beside him and to Larry's left at the edge of the truck door. Martin was closer to the front of the vehicle, facing roughly toward the back, with Larry to the right of Martin, facing roughly toward the front of the vehicle. What happened at this door is critical to the searches of the vehicle which followed, and as might be expected, the versions given by the police and the Dudleys are quite divergent.

## A. Disputed Facts

Martin testified that he asked Larry for permission to "look in" the truck. (MTS Tr. at 13.) According to him, Larry responded: "Sure, go ahead. There is nothing else in there." (*Id.* at 13.) As Martin asked this question he admits he was looking inside the open truck door—he claims to have seen approximately two inches of what appeared to be the barrel of a .12 gauge shotgun sticking out from behind the passenger side seat.[4] Supposedly, the barrel was pointed at

only to the observation of guns in the vehicle rather than the attempted sale of guns was confirmed by one of the other policeman on the scene, former Seymour Police Officer David Carmichael. (*Id.* at 65.) This version was also corroborated by Bureau of Alcohol, Tobacco, and Firearms Agent Hill who testified at the probable cause/detention hearing, based on his discussions with officers of the Seymour Police Department and a review of their reports, that the telephone call to the Seymour police reported that a passerby had seen what appeared to be a long-barreled weapon in the front passenger compartment of the Dudley vehicle. (Detention Hrg.Tr. at 7.) Conversely, absolutely no evidence corroborating Martin's version of facts, such as the testimony of the police department dispatcher, the truckstop manager, or Carmichael, was brought forth. In the face of all this contradictory evidence, and in the absence of any corroborating evidence, Martin's testimony regarding the content of the dispatch is not believed.

2. Martin testified that he called for another unit. (MTS Tr. at 10.) However, the radio ticket does not reflect that request. Def's.Ex. 28. Other testimony offered at the hearing indicated the other officers responded to the scene based on the initial radio dispatch, not Martin's supposed call for assistance. This factual discrepancy, while not directly relevant to the legal issues presented, raises further questions about Martin's credibility.

3. Again, there is a dispute about what Martin told Larry. Martin testified he told Larry he had

received a call about several guns in the vehicle and that he (Larry) had been trying to sell them. (MTS Tr. at 11.) Larry, the only other witness to Martin's statement, testified that Martin told him that he had received a call which indicated there were guns in the truck, without mentioning any attempted sales of the guns. (MTS Tr. at 106.) Considering all of the other evidence regarding the call, it is more probable Martin only mentioned the reported presence of guns in the truck, not the attempted sales.

4. In an attempt to more accurately understand the physical layout of the Dudleys' truck, and the possible orientation and placement of the weapon behind the seat, the court granted Defendants' Motion to View the Vehicle and inspected the truck and weapons on March 25, 1994. Upon a closer look, and after manipulating the discovered shotgun in the truck, it seems physically impossible based on the arrangement of the seat and other items in the vehicle to conclude Martin's testimony is accurate. Either the gun was not protruding from behind the seat at all, or the entire barrel of the gun had to be visible; the geometry of the seat and speaker box behind the seat (both reasonably permanently affixed), the length of the weapon, and the vantage point from which Martin had to see the gun compel one or the other conclusion—but not Martin's. Again, while the visibility of the weapon turns out to be less than critical to the legal issues presented, this discrepancy raises more questions regarding Martin's reliability and credibility as a witness.

an angle towards the driver's seat. According to Martin, after obtaining permission to look inside the truck, he raised his right hand between himself and Larry, leaned towards the truck, pulled the back of the driver's seat forward and reached behind the driver's seat and grabbed the shot-gun barrel. Indeed, it was a shotgun, less than legal length with a pistol grip modification. As Martin withdrew from the truck he claims to have observed a black nylon belt and holster behind the driver's seat containing .20 gauge shotgun shells, .38 special and .25 automatic ammunition in the belt, which he picked up and placed on the driver's side floorboard of the truck. As Martin exited the truck with the shotgun, Larry told him that his father had given him the gun. Larry and Martin then walked to the back of the truck. Former Officer Carmichael testified he arrived after Martin and Corporal Lamb were already at the truck.[5] He parked his vehicle about twenty or thirty yards behind the truck and approached the back of the truck where Lamb was located with Susan Dudley who was sitting on the ground with an air rifle nearby. Carmichael did overhear a portion of the conversation at the door between Martin and Larry—he heard Martin ask for permission to "look in" the truck, to which Larry responded "go ahead—there aren't any other guns in the vehicle". (MTS Tr. p. 67.)

Larry Dudley's version of this portion of the incident is, as one might imagine, quite different. Larry testified that Martin proceeded directly to the driver's side door of the truck without looking at the air rifles. At the door, according to Larry, Martin simultaneously reached into the truck as he asked permission to search the vehicle.[6] Rather than unequivocally consenting to Martin's request for permission to search, Larry contends he said "[i]t is apparent you are going to any way." (MTS Tr. p. 106.) As Larry was responding, Martin was supposedly already inside the vehicle moving things around. Larry noted that Martin's first venture into the truck did not produce anything (other than a BB pistol); so Martin moved away from the driver's side door, rounded the front of the truck, to the passenger side door. At that location Martin rooted around the passenger side of the cab and asked Larry if he had any other guns. After Larry told him about the air rifles in the "camper" part of the truck, Larry and Martin proceeded to the back of the truck and Larry climbed in, purportedly because Martin could not fit in that part of the truck,[7] and voluntarily retrieved the air rifles. (MTS Tr. at 107.) But these rifles did not satisfy Martin, who insisted that the call was about guns, not air rifles. According to Larry, Martin returned to the driver's side door, pushed forward the back of the driver's seat, and began moving items around until he found the .12 gauge shotgun behind the passenger seat. Larry contends the weapon was laying flat behind the seat, was completely wrapped in a towel, with no part of it visible without rummaging through the disorganized clutter under which it was concealed.[8] (MTS Tr. p. 107.) After discovering the gun, Martin purportedly said "what do we have here?" and ordered Larry and Susan to the back of the truck to sit down on the ground. While the stories continue to diverge beyond this point, this is a good

5. Carmichael is now employed by the Seymour fire department. Officer Lamb testified only about the contents of the radio dispatch record of the encounter with the Dudleys. Although Lamb arrived at the scene three minutes after Martin, and presumably witnessed the bulk of the encounter, his testimony about events occurring there was (curiously) not presented.

6. Evidence was introduced by the Defendants that the noise level at the site was rather high because of passing traffic and the truckstop activity, presumably to challenge the conclusion that Larry's consent to the search was made knowingly. However, there was no indication Martin and Larry had any difficulty hearing each other, especially because of their close proximity during the critical moments of the encounter.

7. Based on appearances, Sgt. Martin was considerably larger than Larry. Larry appeared to be approximately 5'8" and 150 pounds. Sgt. Martin appeared to be several inches taller and at least 100 pounds heavier. These are estimates only, and are not likely to be exact. Nonetheless, the relative difference in size is within that proportion.

8. As indicated above in footnote 4, this proposed position of the gun (setting aside the possibility it was wrapped in a towel) is one of two possible positions the gun could have occupied.

moment at which to pause to consider which version of the above events is more credible.

## B. Resolution of Disputed Facts

Ordinarily, this decision appears quite simple. When two law enforcement officers engage in a swearing contest against a convicted felon facing the possibility of a substantial prison sentence if convicted on the charges, the officers tend to prevail. This, however, is not the usual case and, when fully considered, the credibility balance is quite closer. Having had the benefit of observing the testimony and demeanor of these witnesses, the exhibits, and the vehicle itself, flesh is added to what on paper might appear to be a sterile difference in memory or impression of the witnesses. Considering all these facts and factors, the court can, and must, find that the preponderance of the evidence indicates the true facts consist of a conglomeration of the perceptions of the witnesses and consists of parts of what each testified to as the truth. To the extent Martin's testimony is discredited in part, it must be remembered his testimony began with an exaggeration of the content of the radio dispatch in a manner favoring the Government's position. Such an unglamorous beginning did not bolster his credibility, especially considering he had ample opportunity to review his notes and records (and those of the Seymour Police Department) before taking the stand. From this first mis-step Martin continued to testify to facts which were either contradicted by other probative evidence and testimony, or logically or physically inconsistent. Considering all of the evidence and reasonable inferences therefrom, the court finds the following to be the true manner in which the first pistol grip shotgun was discovered.

Upon arriving at the scene, Martin parked his vehicle approximately fifteen to twenty yards from the driver's side of the truck. It was evident to Martin, as he approached the truck, that it was disabled. Martin and Larry met about halfway between Martin's police car and the truck where Martin related the gist of the radio call, that is, he had received a radio message reporting the pres-

ence of guns in the truck. Larry conceded he and Susan had air rifles that might have been mistaken for guns and accompanied Martin to the back of the truck where he retrieved the air rifles. The rifles were left behind the truck where Susan remained. Martin, unsatisfied with the air rifles, told Larry he did not think these were the guns which had been reported as the two of them walked toward the open driver's side door. About this time, Officer Lamb arrived. Lamb, noticing Susan holding the air rifle, reached for his sidearm and ordered Susan to drop the weapon. Although Susan repeatedly assured him it was only an air rifle, Lamb took the rifle and ordered her to sit on the ground. Meanwhile at the driver's door, Martin and Larry stopped, with Martin slightly ahead of Larry and to the sergeant's left. Martin looked into the truck but, contrary to his testimony, did not observe the presence of any weapon in the vehicle. He then leaned into the driver's side of the cabin of the truck, looking around the area behind the seatbacks while contemporaneously asking Larry's permission to "look into" the truck. In doing so, Martin placed his left hand across Larry's chest to restrain him and to prevent Larry from accessing Martin's sidearm. When Larry responded, Martin had already reached inside the truck and pushed the driver's seatback forward. Larry responded, in a somewhat resigned fashion, "it looks like you are going to any way," saying nothing further about Martin's activities. Martin and Carmichael took this statement (and Larry's lack of additional protest) as consent to search. Martin continued on with his search until he located the shotgun, which was wrapped in a towel and was otherwise concealed by the disarray of items laying behind the seats. The pistol grip shotgun appeared to be a .12 gauge, but was clearly shorter than legal length under Indiana law. Martin was withdrawing from the truck when he noticed a black nylon belt and holster behind the driver's seat, containing .20 gauge shotgun shells, .38 special and .25 automatic ammunition visible in the belt;[9]

9. Larry testified the belt was in the bed portion of the truck and that he saw Sgt. Martin reach through the window in the back of the cab to the

bed portion to pull the belt out. However, Larry's testimony was not credible on this point because, among other reasons, he purportedly

Martin placed the belt on the driver's side floorboard of the truck. As he exited the truck with the shotgun, Martin said "what do we have here?", to which Larry explained his father had given him the gun. Martin escorted Larry to the back of the truck where he was told to wait with his wife.

## C. Other Factual Issues

The Dudleys and the Seymour Police Officers dispute numerous other points of evidence. The most direct way to deal with these disputes is to find the remainder of the events to have occurred as indicated below. To the extent that significant disputes are raised as to the occurrences at the scene, they will be noted. Martin gave the shotgun to Lamb who, walked to his (Lamb's) car and measured it, determining it to have an overall length of 19″ and a barrel length of 14½″— illegal under Indiana law. *See* IND.CODE § 35–47–5–4.1(a)(6) (Burns 1994). Lamb locked the .12 gauge shotgun in the trunk of his car while Carmichael advised both Dudleys of their Miranda rights.[10] Both Dudleys said they understood their rights. After Carmichael handcuffed Larry, the officers conferred near the passenger side of the truck. They decided Larry was to be arrested for possession of the illegal firearm with Lamb as the arresting officer; Lamb arrested and advised him of the reason for the

arrest, to which Larry responded that the gun was his father's and was used for hunting, contending the gun was legal in the state from which he had come.[11] Carmichael asked both Larry and Susan about the .20 gauge ammunition and the .38 and .25 handgun ammunition because it suggested the presence of other firearms in the vehicle. Larry explained he had never shot the gun nor knew it was a .12 rather than a .20 gauge.

Before Larry was transported away from the scene, Susan denied, upon questioning by the officers, the presence of other weapons in the vehicle. After Lamb placed Larry in his police car to transport him to the Seymour Police Department, Susan was again asked if there were any other firearms in the truck; she became upset and stated she said anything about other firearms Larry would kill her. (MTS Tr. p. 71.) After Larry was taken away, the officers explained Larry was gone and that she could now tell them if any other weapons were in the vehicle—Carmichael emphasized they needed to know for their own safety. After she disclosed that there was another gun in the back of the truck, Carmichael climbed into the back of the vehicle and returned with the second sawed off shotgun.[12] Finding this, the offi-

---

saw this while seated to the rear of the truck. His only line of vision would have been through the improvised camper bed. Given the disarray of the camper and the poor lighting conditions in that bed because of its construction and the tarp over the front part of the truck, it is extremely unlikely that he could have seen anything inside the truck from where he was. Accordingly, Martin's testimony is more credible on this point.

10. Susan Dudley testified that she was not advised of her rights at the truckstop, but only received these rights upon being interviewed days later by A.T.F. Agent Hill at the police station. As will shortly be seen, whether Susan was advised of her rights at the truckstop is really immaterial to the decision of this motion; under either possible version of the facts her subsequent statements leading to the second shotgun are inadmissible. *See infra* p. 583.

11. Besides being incorrect about the illegal nature of sawed-off shotguns in Alabama, *see Ala. Code* § 13A–11–63(a) (1993), at the suppression hearing Larry denied he made any of these statements. However, his denial was not credible and is not accepted as true.

12. A significant dispute exists regarding the manner in which the second gun was found. The officers testified Susan, not Carmichael, climbed into the truck and retrieved the gun. By this view, Susan stopped Carmichael as he was about to enter the vehicle and told him he would never find the gun; Susan, with the officers' permission, entered the truck and retrieved the gun. However, Susan's testimony, reflected in the recitation in the text seems to be a more believable version of the events. The Government concedes that allowing a possible suspect to retrieve a loaded weapon from a dimly lit truck, after one dangerous weapon has already been discovered and an arrest has been made, is not text book procedure; in fact, it simply isn't safe. Given this danger, it is highly improbable events unfolded as the officers suggest. Instead, Susan's testimony seems more likely, allowing the court to find that Carmichael himself entered the truck and found the gun. More importantly, however, is the fact that despite which version of the facts is the truth, the result is the same—the weapon's location was disclosed only as a result of the illegal discovery of the first shotgun. *See infra* p. 584.

cers called Lamb to return to the scene and take custody of the second weapon, deciding also to arrest Susan for possession of an illegal firearm. After Lamb left the second time, Martin and Carmichael decided to impound the vehicle and began an inventory search. Susan was instructed to sit on a cooler while Carmichael began to inventory the contents of the truck.

Carmichael climbed into the vehicle and began removing the items he though might have some value. Supposedly, he intended to go through every item first, and then record those items he deemed necessary to list, although it is undisputed that neither officer had pen nor paper to assist them while they conducted the inventory. This continued for a short time until a black vinyl (or leather-type) case (like a cassette carrying case or a shaving kit) was discovered located on the top of the truck. Opening it, Carmichael saw some clothing articles and what appeared to be cassette tape containers. Inside those containers he found some strange looking objects with ball bearings attached to the side and a fuse hanging out. He handed one down to Martin, who immediately recognized it as a pipe bomb, ordered Carmichael to come off the vehicle after handing down the case. The officers summoned an Indiana State Police bomb squad which arrived some time later and conclusively determined the objects were in fact three pipe bombs. Various loose components used on the bombs were also found in the vehicle. Susan, asked about the bombs, stated Larry made them, that he was a kid and those were his toys, and that he used them for protection. Meanwhile, Lamb was in the booking area of the Seymour Police Department with Larry when he heard Martin on the police radio say they had located what appeared to be three pipe bombs. Larry, overhearing the radio transmission, told Lamb the pipe bombs were for his bow and arrow; Larry further said the pipe bombs were explosives. The bombs, after being photographed and detonated by the bomb squad, were collected as evidence. Additionally, Susan was formally arrested and taken to the Seymour Police Department. No formal written inventory or other listing of the objects found in the truck was ever made by Officers Martin or Carmi-chael, but the vehicle and its contents was videotaped the next day after the truck was moved to an impoundment location.

## II. Analysis

■ The Fourth Amendment, applicable to the states through the Fourteenth Amendment's Due Process clause, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. CONST. amend. IV. Central to Fourth Amendment jurisprudence is the notion that a search without a search warrant is per se unreasonable, *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983), and therefore unconstitutional unless one of the few well-established, and narrowly-defined, exceptions to the warrant requirement is present. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). If a search is conducted without a warrant, as is readily admitted in this case, the Government shoulders the burden of proving by a preponderance of the evidence the applicability of one of these exceptions to validate the search. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.), cert. denied, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987); *United States v. Long-mire*, 761 F.2d 411, 418 (7th Cir.1985). Larry and Susan Dudley seek to suppress both shotguns, the pipe bombs, and any all statements which they made during the searches. For each phase of the search the Government offers multiple justifications.

### A. Discovery of the First Shotgun

#### 1. Protective Search Incident to "Terry" Stop

■ Three categories of police-citizen encounters have evolved under the Fourth Amendment, each different from the other based on the degree of intrusion into a citizen's liberty. First and most intrusive is an arrest, a Fourth Amendment "seizure" which is allowed only if the police have probable cause to believe the arrestee has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142

(1964); *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). Next, and slightly less invasive is the so-called *"Terry* stop," another form of "seizure," but a sort of "semi-arrest," *United States v. Ornelas–Ledesma,* 16 F.3d 714, 719 (7th Cir.1994), lawful only if the police officer had a "reasonable suspicion supported by articulable facts" that those stopped were engaged, or about to engage in criminal conduct. *Terry v. Ohio,* 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). *See also United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Lastly the police may always seek a citizen's voluntary cooperation, through non-coercive questioning, with or without any amount of suspicion of criminal activity. *United States v. Withers,* 972 F.2d 837, 841 (7th Cir.1992); *United States v. Cardona–Rivera,* 904 F.2d 1149, 1153 (7th Cir.1990). Such an encounter amounts to absolutely no restraint on the individual's liberty and is not a "seizure" which engenders Fourth Amendment protection. *Withers,* 972 F.2d at 841. However, absent some level of suspicion of criminal activity, a consensual encounter cannot justify a search of any magnitude unless the consent extends to the search as well as to the questioning. Into these latter two categories is where the Government hopes to pigeon-hole much of the search activity occurring during Dudleys' evening with the Seymour police.

In *Terry v. Ohio,* the Supreme Court held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a limited search ("patdown") of the person "to determine whether the person is in fact carrying a weapon." *Id.,* 392 U.S. at 24, 88 S.Ct. at 1881. Evolving from *Terry* is the notion that:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from

those facts, reasonable warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880). Stating a police officer may intrude into a person's privacy in this limited manner to guarantee the officer's safety presupposes that the officer is engaged in a lawful encounter with the citizen subject to the search. *See Terry,* 392 U.S. at 24, 88 S.Ct. at 1881; *Ornelas–Ledesma,* 16 F.3d at 179. *See also United States v. Cervantes,* 19 F.3d 1151, 1154 (7th Cir.1994) (noting "[r]easonable suspicion would have justified the officers in making an investigatory stop (a *"Terry* stop") of [defendant], and when the person stopped is in a car the officers are entitled to search not only the person but also the car, including accessible closed compartments in it, for possible weapons that might endanger the officers."). The lawfulness of the encounter, in turn, depends on "the extent of the intrusion on the rights of the individual as well as on the reason for the restraint." *United States v. Tilmon,* 19 F.3d 1221, 1223 (7th Cir.1994). Scrutiny of this encounter, and actually all searches based on reasonable suspicion and officer safety, thus involves three different steps. First, did the officers "seize" the Dudleys in any manner relevant to the Fourth Amendment. If so, the second question concerns whether the officer's possessed the concomitant degree of suspicion necessary to support this detention under the Fourth Amendment; if not, the analysis stops because the Fourth Amendment has been violated. Lastly, even if the "seizure" of the Dudleys was constitutionally justified, the Government must still support the search of their vehicle by showing " 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonable warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long,* 463 U.S. at 1049–50, 103 S.Ct. at 3480–81. This laborious analysis is quite important because if the Dudleys were either unconstitutionally seized, or their

truck wrongfully searched, any evidence procured as a direct result of this illegality is inadmissible to prove their guilt. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

■ "A police intervention may be a seizure if, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Packer,* 15 F.3d. 654, 657 (7th Cir.1994) (quoting *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). Facts relevant to this assessment include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980), as well as the location of the encounter (public versus private location) and whether the officers informed the suspects they were free to leave. *U.S. v. Adebayo,* 985 F.2d 1333, 1338 (7th Cir.1993). Martin's initial questioning of Larry, along with the walk to the back of the truck to retrieve the two air rifles seems relatively innocuous, if not completely consensual; only one officer was present, no display of weapons (initially) or physical touching occurred, nor was language or a tone of voice used which might make Larry think his cooperation was compelled. However, a "consensual encounter can develop into an investigatory detention as a consequence of police behavior," *Withers,* 972 F.2d at 842. Exactly that occurred next. One other police officer, Carmichael, arrived on the scene; upon noticing Susan holding the air rifle (Martin had given it to her after Larry removed it from the truck), Carmichael reached for his own weapon (though nothing indicates he unholstered it), told Susan to drop the rifle, and ordered her to sit on the ground. Carmichael remained at the rear of the vehicle "guarding" Susan. Martin, telling Larry he though the radio report about the presence of guns

meant something more than mere air rifles, accompanied Larry to the driver's side door of the truck; Officer Lamb arrived, remaining at the back of the truck with Susan and Officer Carmichael. Additionally, immediately before Martin reached into the truck to extract the shotgun, he placed his hand across Larry's chest purportedly to protect his weapon from Larry's reach. The presence of three police officers, the failure of the officers to inform the Dudleys they were free to leave, Martin restraining (albeit momentarily) Larry with his arm, the continued questioning of Larry about the presence of weapons in the vehicle while relentlessly following him around the truck, together with the fact that Susan had been ordered to sit on the ground while Carmichael and Lamb watched over her, tilt the scales and present a "show of authority" by police officers, *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, making "the circumstances of the encounter so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded...." *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Larry and Susan were, at this point, no longer engaged in a consensual encounter with the police; rather, they were seized. *Cf. United States v. High,* 921 F.2d 112, 116 (7th Cir.1990) (finding seizure did not occur when officers "questioning was not repetitive, intense, or threatening."); *United States v. Knox,* 839 F.2d 285, 289 (6th Cir.) (verbal commands to suspect to move location or stay in place can be a seizure), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Certainly "police officers ... faced with what is essentially a fluid situation ... are permitted to graduate their responses to the demands of the particular circumstances confronting them." *United States v. Weaver,* 8 F.3d 1240, 1243 (7th Cir.1993). Those responses, however, must be reasonable under the circumstances and actuated by the appropriate level of suspicion; in this case they were not.

■ The simple fact that a seizure occurred is of relatively little moment assuming the police are able to support their conduct with the requisite level of suspicion to satisfy the Fourth Amendment. Being less than an

arrest, the seizure falls within the middle category of the brief, investigatory *Terry*-stop. To justify this conduct the officers must have had a "reasonable suspicion supported by articulable facts" that the Dudleys were engaged in criminal activity. Martin's impetus to investigate the Dudleys was a radio call alerting him to the presence of two people at the truckstop in possession of some guns. Of course the possession of firearms is not, generally speaking, a crime unless you happen to be a convicted felon, the firearms are otherwise illegal, or you are not licensed to possess the gun. Martin, presumably not clairvoyant, could not have known, and did not know, the Dudleys and their guns met all three of these criteria. In fact he testified he had absolutely no knowledge, or suspicion, that the Dudleys were engaged in any criminal activity until he discovered the first sawed-off shotgun.[13] A telephone report of citizens possessing guns or merely engaging in "suspicious" activity, standing alone, cannot amount to reasonable suspicion of crime. *Packer*, 15 F.3d at 658 (telephone tip about suspicious vehicle "lacked the minimal detail of information that would point to any arguably particularized suspicion of criminal conduct."). Moreover, all the other circumstances which might add to the officer's suspicion are even less noteworthy—the ramshackled vehicle and the presence of two relatively harmless (and quite legal) air rifles are equally innocuous.

While realizing "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot," *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980), and that "[i]n making a determination of probable cause [or reasonable suspicion] the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts," *Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2334–35 n. 13, 76 L.Ed.2d 527 (1983), all of these facts, separately or cumulatively, fail to carry the amount of suspicion necessary to

provide the "minimal level of objective justification," *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585, for the police officer's intrusion into the Dudleys' protected Fourth Amendment rights. Agreed, the sight of the Dudleys' truck, overloaded with goods and converted into a camper, together with a report of guns is somewhat odd; but some mere "inchoate and unparticularized suspicion or 'hunch', *id.*, without more, is simply not enough to justify an investigatory stop." In short, the Government failed to establish by a preponderance of the evidence that some reasonable suspicion of criminal activity, based on articulable facts, justified this seizure. And, if the stop itself is unlawful, neither *Terry* nor *Michigan v. Long* authorize the police to search the suspects or the suspect's vehicle for weapons, even if the officers reasonably fear for their safety. *See Packer*, 15 F.3d at 659; *United States v. Fryer*, 974 F.2d 813, 819 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 641 (1993); *United States v. Denney*, 771 F.2d 318, 321 (7th Cir.1985); *Longmire*, 761 F.2d at 419. Thus, neither the initial seizure nor turned up the first shotgun, can be justified as incident to an investigatory detention.

## 2. Consent

 Despite the unconstitutional seizure and search of Larry and Susan, the Government contends Larry consented to the search of the vehicle. This argument fails for two reasons: First because the search started before consent was given and, second, because the consent was procured as a result of a the initial illegal seizure. Of course, any citizen may capitulate their Fourth Amendment protection and authorize the state to enter an otherwise protected sphere of individual autonomy. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1972); *United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir.1994) ("The Fourth Amendment bars unreasonable searches, and 'it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.'"). And, that con-

---

**13.** While the existence of reasonable suspicion is certainly an objective test which does not depend on the actual subjective belief of the police officer, it is interesting to note that a trained police officer on the scene readily admits he had absolutely no articulable suspicion of any criminal conduct.

sent can validate an otherwise unconstitutional search if the Government proves, by a preponderance of the evidence consent was "freely and .voluntarily given," *Id.*, 412 U.S. at 222, 93 S.Ct. at 2045 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968)), based on the "totality of all the circumstances" as shown by the evidence. *Id.*, 412 U.S. at 227, 93 S.Ct. at 2047; *United States v. White*, 979 F.2d 539, 542 (7th Cir.1992). Even a consensual search can be unreasonable and violative of the Fourth Amendment, however, *Jachimko*, 19 F.3d at 299 n. 3, and "[c]onsent obtained after an illegal seizure is invalid unless it can be shown that the consent was in fact 'sufficiently an act of free will to purge the primary taint' of the unlawful seizure." *McGann v. Northeast Ill. Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963)). To purge the taint, the Government must prove "a break in the causal connection between the illegality and the consent given." *Id.; United States v. Sanchez–Jaramillo*, 637 F.2d 1094, 1099 (7th Cir.) ("We must determine 'whether' granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."), *cert. denied*, 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980). Having already decided Larry and Susan were illegally seized, the Government now "bears a heavy burden of demonstrating that consent given subsequent to [the] illegal detention was properly obtained." *Sanchez–Jaramillo*, 673 F.2d at 1099.

▮ Of particular importance in evaluating the taintedness of the subsequent consent are: "(1) the temporal proximity of the illegal detention and [Larry's] willingness to [let Martin search]; (2) the presence of intervening factors between the two events; and (3) the circumstances surrounding, and the nature of, the official misconduct." *Id.* Little temporal space fits between the moment Larry and Susan were seized without reasonable suspicion and the point at which Martin purportedly obtained Larry's consent to the search the vehicle. At one moment all three officers were standing amidst the Dudleys, with Martin bearing down on Larry seeking answers to questions about guns in the truck; immediately thereafter Martin looks into the cab of the truck, allegedly asks to search the vehicle, and receives Dudley's purported acquiescence. "When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." *McGann*, 8 F.3d at 1183; *see also United States v. Fazio*, 914 F.2d 950, 957–58 (7th Cir.1990) (focusing on one hour time between illegal search and confession to find confession sufficiently untainted to admit). Absolutely no event occurred in the slim moments between seizure and consent which might alleviate the taint of the improper detention. *Cf. United States v. Valencia*, 913 F.2d 378, 382 (7th Cir.1990) (finding no "nexus" between illegal entry and latter consent sufficient to invalidate consent when over one hour passed between entry and consent and police did not exploit illegality or coerce suspect). Rejection of Larry's consent also comports with the underlying purpose of the exclusionary rule, "to deter future unlawful police conduct," *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974), when consent is garnered during the coercive and threatening circumstances of an illegal seizure such as this. *Cf. Cervantes*, 19 F.3d at 1153 ("The exclusionary rule is intended to protect the privacy and property rights of the citizen, rather than to punish law enforcement officers for trickery, deceit, or even telling lies under oath.").

▮ But even if the initial unlawful seizure had not occurred, Dudley's consent still seems insufficiently voluntary, knowing, and unequivocal to waive his Fourth Amendment rights. For one thing, the facts tend to indicate Martin actually began the search— or at least initiated the intrusion—before Dudley's alleged consent was ever received. Standing at the door of the truck, Martin reached into the passenger compartment at the same moment he asked if could look in

the truck; only then did Dudley respond to the request. No amount of *ex post* consent in the world can validate a search which has already occurred. And if that isn't enough, Larry's response does not amount to unequivocal consent to search. Larry, did not affirmatively grant the request; instead, in an almost resigned fashion, Larry simply said "it looks like you are going to anyway,"—far from an unequivocal waiver of rights. *See, e.g., United States v. Allard,* 600 F.2d 1301, 1304 (9th Cir.1979) (responding "I suppose I don't have any choice" to request to search insufficient to demonstrate consent). Other factors, while not independently dispositive, cumulatively militate towards the involuntariness of the consent, including the failure of the police to inform Larry he had the right not to consent, lack of advice regarding his other constitutional rights, and the inherently coercive nature of being practically surrounded by three police officers. *See, e.g., United States v. Kozinski,* 16 F.3d 795, 800 (7th Cir.1994) (listing relevant factors); *United States v. Rojas,* 783 F.2d 105, 109 (7th Cir.) (same), *cert. denied,* 479 U.S. 856, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986). So not only was this "consent" tainted by the prior illegal seizure, it was not voluntary and was obtained after the search was initiated. *Cf. Valencia,* 913 F.2d at 382 (upholding consent following assumed illegal entry because, *inter alia,* consent was voluntary and free).

Martin's warrantless search, and the accompanying discovery of the first shotgun and ammunition belt, cannot be justified as either a consent search or a protective search. Moreover, it is "[e]vidence obtained as a direct result of an unconstitutional search or seizure," and is "plainly subject to exclusion." *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984). There is, in other words, clearly no Fourth Amendment justification for Officer Martin's conduct in reaching inside the truck to obtain the first shotgun and other items. The Government has failed to meet its burden of demonstrating the applicability of an exception to the warrant requirement of the Fourth Amendment to justify this search without a warrant. Absent this justification, the first shotgun, and all other items Martin found when searching

the front seat, must be suppressed from evidence in the prosecution of this crime as the fruit of an illegal search and seizure. Moreover, any statement Larry made while this search was being executed is likewise the product of the illegality and must be suppressed.

### B. Production of Second Shotgun

#### 1. Consent

■ That decision does not, however, answer the question of the admissibility of the second sawed-off shotgun which Officer Carmichael retrieved from the back of the truck. The Government of course contends Susan, not Carmichael, retrieved the gun and that this was not a search at all; rather, Susan voluntarily produced the weapon and the police never entered the vehicle. This version of events is highly unlikely however and is not accepted as true. Instead, it is more likely that Carmichael retrieved the gun on his own from the truck. Was this search supported by reasonable suspicion, and the needs of officer safety, given the discovery of the first gun? While the answer to this question at first glance seems to be "yes," in the abstract, a little more context is necessary to fully understand the circumstances in which this search occurred. Susan was left standing at the truck with officers Carmichael and Martin after Lamb had departed with her husband for the police station—Larry had been arrested for possessing the first discovered shotgun. Having found, during the first illegal search, a pistol belt containing ammunition for three different types of weapons than the one weapon actually found, the police believed other guns had to be in the truck. Asking Susan again whether any other guns were in the truck (they asked her once before Larry was taken away), she finally responded that one other gun was in the truck and Carmichael climbed in and retrieved it.

Even evidence which is not the immediate product of an illegal search or seizure is sometimes inadmissible if "found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) (quoting *Nardone v. United States,* 308 U.S. 338, 341,

60 S.Ct. 266, 267, 84 L.Ed. 307 (1939)). Admitting that the production of the second shotgun was not the "direct result" of the unconstitutional seizure, the question is "whether the challenged evidence was 'come at by exploitation of [the initial] illegality instead of by means *sufficiently distinguishable* to be purged of the primary taint.'" *Id.* (quoting *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963)) (internal quotation marks omitted). The discovery of the ammunition belt during the initial search of the passenger compartment, replete with ammunition for three different types of guns other than the shotgun which was discovered, is the admitted basis for questioning Susan about the presence of other guns in the vehicle—and the questioning led to production of the second gun. Thus one could conclude that "but for" the wrongly discovered ammo belt (wrong for two reasons, the improper seizure and the illegal search), the second shotgun would never have been found; this is not the test, however, for the Supreme Court has expressly rejected a " 'per se' or 'but for' rule of causation that would render inadmissible all evidence discovered through a chain of causation that started with illegal police action." *United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978) (internal quotation marks omitted); *Fazio,* 914 F.2d at 957.

The real question, as indicated in *Segura,* is whether the second shot gun was derived by "exploitation of [the initial] illegality instead of by means *sufficiently distinguishable* to be purged of the 'primary taint.'" *Segura,* 468 U.S. at 804, 104 S.Ct. at 3385. More importantly, and as alluded to above, the exclusionary rule is only applied in "those areas where its remedial objectives are thought most efficaciously served." *United States v. Leon,* 468 U.S. 897, 908, 104 S.Ct. 3405, 3413, 82 L.Ed.2d 677 (1984). Plainly the prior analysis concerning Larry's supposed consent is a permutation of this idea; in that instance consent was intimately connected with the illegal seizure, causing it to be less than voluntary and a result of the officer's unconstitutional conduct. There, no intervening act occurred which might have "purged the primary taint" of the bad seizure. Here there are two acts which might alter the result: (1) Susan was supposedly informed of her "Miranda" rights before being questioned about the gun [14], and (2) the officers may have derived reasonable suspicion of the presence of weapons from the discovery of the first gun. In the context of a confession following arrest, providing a suspect with his "Miranda" warnings will not, alone, attenuate the taint of an unlawful arrest, but the fact they were given is "an important factor ... in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). Here, however, the close causal and temporal connection between Susan's statements about the guns and the prior illegal search dissipates whatever independent value *Miranda* warning may have held. Her revelation of the presence of that weapon did not rise or fall on the provision of Miranda warnings—warnings more oriented towards incriminating statements and confessions than the production of a shotgun from the back of a truck. Not that the line separating the two are that distinct; informing the officers of the location of the weapon is indeed the type of incriminating statement which the Fifth Amendment protects. *E.g., Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). But where, as here, the other circumstances surrounding the suspect's incriminating conduct so overwhelmingly tie her act to the prior illegal conduct of the police, Miranda warnings just aren't enough to purge the taint.

## 2. Reasonable Suspicion or Probable Cause

█ Was the search justified under *Terry* or *Michigan v. Long?* Not quite. First, the unconstitutional seizure of the Dudleys, and the subsequent illegal search of the pas-

14. As indicated above there exists a factual dispute regarding whether Susan was actually advised of her rights *before* she admitted the presence of the gun. For purposes of this discussion, however, the officer's version will be accepted and used to analyze the issue; for even if the version most favorable to the Government is believed, it is insufficient to justify the search. This is not to say, however, that the court finds as a fact the officer's version to be true.

senger compartment, resulted in the discovery of the ammo belt which led the police to the second shotgun. *Cf. U.S. v. Fuesting,* 845 F.2d 664, 672 (7th Cir.1988) (rejecting suppression when "no evidence in the present case to suggest that the warrantless entry into the defendant's residence led to the discovery of the evidence seized....."). Susan did not, out of thin air, just happen to tell the officers about an additional gun. Instead, her statement followed questioning based on evidence found during the prior illegal search—the ammunition belt. Informing the officers of the presence of the gun, which in large part resulted from the coercive circumstances of the illegal seizure, is not the type of "means sufficiently distinguishable" from the initial seizure "to be purged of the 'primary taint.'" *Segura,* 468 U.S. at 804, 104 S.Ct. at 3385. The discovery of the second shotgun, rather than being "so attenuated as to dissipate the taint" of the initial illegality, *id.* at 805, 104 S.Ct. at 3385, was "evidence that would not have been obtained without a [constitutional] violation" and thus "increase[d] the victim's risk of being convicted of a crime." *United States v. Salgado,* 807 F.2d 603, 607 (7th Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988). This sort of conduct, and the evidence which it produced, is exactly what the exclusionary rule hopes to deter. Thus, discovery of the second shotgun was at least an indirect result of the bad conduct of the police officers; absent some mitigating intervening independent source for the gun, it must be suppressed as a fruit of the wrongful seizure and search. Neither does any reasonable suspicion or reasonable belief about the presence of weapons in the truck support this search. For one thing, even if such existed, *Michigan v. Long* only authorizes a search of the *passenger compartment* of a vehicle, not the deep recesses

of the bed of a truck. *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983). For another thing, the reasonable beliefs held by the officers were derived from the illegal search of the truck and seizure of the first gun and ammo belt and are thus a "fruit" of the illegality. For the same reason even the existence of probable cause to believe the truck contained evidence or contraband of a crime—which normally allows the entire vehicle to be searched, *California v. Acevedo,* 500 U.S. 565, 579, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991)—would not support Carmichael's search; this probable cause, assuming it existed, would be based solely on the illegal discovery of the first gun and ammunition belt and thus also a product of the tainted search. Accordingly neither the second shotgun nor Susan's statements were legally derived and must be suppressed.

## C. Pipe Bombs and Inventory Search

 That leaves only the pipe bombs discovered during Carmichael and Martin's "inventory" search of the truck. Without a doubt law enforcement officers may, pursuant to standardized policies and procedures, lawfully search an impounded vehicle and inventory its contents without a warrant under the Fourth Amendment. *Colorado v. Bertine,* 479 U.S. 367, 372–73, 107 S.Ct. 738, 741–42, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Within this exception to the warrant requirement, police can even open closed containers found in the vehicle and search their contents. *Bertine,* 479 U.S. at 374–75, 107 S.Ct. at 742–43. Perhaps Carmichael and Martin's inventory of the Dudley truck, according to established department procedures, was completely constitutional under this doctrine.[15] However, and as discussed immediately above, even evi-

---

15. But even that conclusion is not certain. The procedures the pair used during this supposed inventory search were less than standard. Neither officer made a written record of their search results, nor even had a pen and paper out to make a record. As for the Seymour Police Department's standard policy on this subject, it directs "[t]he results of the inventory shall be recorded on the approved report." Govt's Ex. 9. at III.C. The failure to follow their own procedures, and the complete failure of Martin and

Carmichael to comply with these rules, raises some suspicion that this search was for the disallowed purpose of "general rummaging in order to discover incriminating evidence," *Florida v. Wells,* 495 U.S. 1, 3, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990), rather than the allowed basis of protecting property and police safety. *Bertine,* 479 U.S. at 374–75, 107 S.Ct. at 742–43. However, this need not be decided because the inventory search too was a direct result of the initial search and seizure.

dence obtained from an otherwise valid search might need to be suppressed as the fruit of a previously occurring illegal search or seizure if that evidence was procured as a result of the illegality. Not to much thought is necessary to realize that the only reason for inventorying the Dudley vehicle was the fact that it was to be impounded; impoundment, in turn, was necessary because both Larry and Susan Dudley were arrested. Why were they arrested? Because the police officers, during two illegal searches, turned up contraband in the form of illegal shotguns. If those searches never occurred the truck would have not been impounded and never inventoried. There was no event which intervened between the illegal searches and the impoundment to somehow justify the inventory search. Thus, similar to the conclusion above, the discovery of the pipe bombs is intimately connected to the initial illegality—the improper seizure of the Dudleys and the illegal search of the passenger compartment. Accordingly, as part of the fall of the dominoes, they too must be suppressed.

### III. Conclusion

Suppressing the fruits of this search will, for all practical purposes, sound the death-knell for the prosecution of the Dudleys; being all too aware of the Dudley's dangerous nature, as owners of sawed-off shotguns and pipe bombs, some sort of *apologia* seems fitting. Simply put, when fundamental constitutional protections are at issue, the ends never justify the means—no matter how criminal the defendants conduct may seem— and even those who society might deem most dangerous or deplorable deserve the same freedoms as the most admired citizen; before the court and the constitution, all are equal. Not that courts are unaware of the difficult job police officers confront on a daily basis. The solemn truth of this awareness was captured quite well recently by the Seventh

Circuit in a passage which bears repeating at length:

> Alongside our holding today, we acknowledge the reality of the mean streets that police officers face every day in their struggle with the criminal element of our society. Police officers such as [these] regularly risk their lives in the interests of public safety, and yet at the same time they are required to justify their conduct. We commend these officers for their diligent response to the citizen's report of concern; however, the evidence obtained from [the] Defendant[s] must still be excluded. While from the relative seclusion of our bench we cannot sufficiently appreciate the difficult circumstances faced by the officers on the beat, we are still required to make what may appear to some as fine legal distinctions. Admittedly, these distinctions are more readily made by a court, with the benefit of briefs and hindsight, than on the street where life and limb are at stake.

*Packer*, 15 F.3d at 659. Here, like *Packer*, the Government simply failed to prove, as it must consonant with its burden, the searches of the Dudleys' vehicle were constitutionally justified. Difficult factual disputes and credibility questions had to be resolved, often in a manner unfavorable to the police officers and the Government. This court does not make these determinations lightly and without due consideration for the consequences.[16] Nonetheless, from all this follows the cold, hard fact that all the evidence procured as a result of these unconstitutional searches, both physical and testimonial, must be suppressed. Therefore, the Defendants' Joint Motion to Suppress evidence is **GRANTED.**

ALL OF WHICH IS ORDERED.

16. The Government argues the officers should be believed because they have no motive to falsify. (MTS Tr. at 173.) Unfortunately, that statement is not always true. There are many potential motives for law enforcement to deviate from the truth, including the desire to see dangerous individuals convicted or to hide an embarrassing mistake. But the issue of motive is simply not the sole, or even the most important, consideration in determining the credibility or believability of a witness. Innocent misrecollection is a sufficient error for the court to discount a law enforcement officer's testimony and to deem the witness less than credible. Thus is matters not why Martin, Carmichael, or any police officer might be inaccurate in recounting the circumstances of an investigatory stop. What does matter is whether they were right or wrong in recollecting the events of this stop, and in this case Martin and Carmichael were wrong on material points.